**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| WEIWEN GU,<br>1804 Cloverlawn Court<br>McLean, VA 22101, | Civil Action No. _____ |
|   Plaintiff, | |
|   v. | |
| SCOTT BESSENT, in his official capacity as<br>Secretary, U.S. Department of the Treasury,<br>1500 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20220, | |
|   Defendant. | |

## COMPLAINT

Plaintiff Weiwen Gu ("Plaintiff" or "Ms. Gu"), by and through undersigned counsel, brings this civil action against Defendant Scott Bessent, in his official capacity as Secretary of the U.S. Department of the Treasury (the "Agency"), and alleges as follows:

## PRELIMINARY STATEMENT

1. This is an action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., including the federal-sector provision, 42 U.S.C. § 2000e-16, and under the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791, for discrimination on the basis of race (Asian), color, national origin (Chinese), and disability; unlawful retaliation for protected equal employment opportunity ("EEO") activity; failure to provide reasonable accommodation; unlawful medical inquiries; and a discriminatory and retaliatory hostile work environment.

2. Ms. Gu is a longtime Internal Revenue Service ("IRS") employee with a record of "Outstanding" performance ratings, and was the only Chinese-American senior manager reporting to Deputy Chief Taxpayer Experience Officer Courtney Kay-Decker ("Ms. Kay-Decker").

1

Beginning in or about October 2023 and continuing to the present, Ms. Kay-Decker and other Agency officials subjected Ms. Gu to an escalating campaign of discrimination and harassment that included, among other things: an anonymous, unsubstantiated "anti-harassment" inquiry that, upon information and belief, was orchestrated to manufacture a pretext against her, and whose exculpatory results were concealed from her; a false and disparaging FY 2024 Mid-Year Review issued days after Ms. Kay-Decker learned of Ms. Gu's harassment complaint against her; a Letter of Admonishment issued just two hours and twenty-five minutes after Ms. Gu submitted a written rebuttal expressly accusing Ms. Kay-Decker of racial discrimination; Ms. Gu's removal from her leadership position and replacement by a White male colleague; reduction-in-force notices premised on the elimination of an office in which Ms. Gu no longer served; Ms. Gu's reassignment back to that dissolved office as the sole direct report of Ms. Kay-Decker, in disregard of physician-imposed medical restrictions; and continuing retaliation culminating in 2026 in a baseless charge of absence without leave ("AWOL") and the withholding of approximately one month's pay — maintained even after Federal Occupational Health ("FOH"), the federal government's occupational health service provider, retroactively approved her leave under the Family and Medical Leave Act ("FMLA").

3.      The Agency's conduct has devastated Ms. Gu's career, health, and finances. She seeks declaratory and injunctive relief; back pay and restoration of all leave and benefits, including more than 2,000 hours of accrued annual and sick leave; compensatory damages, including out-of-pocket medical expenses; full make-whole relief; and attorneys' fees and costs.

## JURISDICTION AND VENUE

2

4.      This Court has jurisdiction over this action pursuant to 42 U.S.C. § 2000e-16(c) and § 2000e-5(f)(3), 29 U.S.C. § 791 and § 794a, and 28 U.S.C. § 1331. Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

5.      Venue is proper in this district pursuant to 42 U.S.C. § 2000e-5(f)(3) because the unlawful employment practices alleged herein were committed within this district, the relevant employment records are maintained and administered within this district, and Plaintiff's official duty station at all relevant times was IRS Headquarters, 1111 Constitution Avenue, N.W., Washington, D.C. 20224, where she worked on site and from which her position was administered during periods of authorized telework.

## PARTIES

6.      Plaintiff Weiwen Gu is a Chinese-American woman. Her race is Asian and her national origin is Chinese. At all relevant times, she was employed by the IRS, a bureau of the U.S. Department of the Treasury, as a Supervisory Management and Program Analyst (senior manager), IR-0343-1, in the Portfolio Management Office ("PMO") of the Taxpayer Experience Office ("TXO"), with an official duty station in Washington, D.C. Plaintiff resides at 1804 Cloverlawn Court, McLean, Virginia 22101.

7.      Defendant Scott Bessent is the Secretary of the U.S. Department of the Treasury and is sued solely in his official capacity. As head of the agency that employed Plaintiff, the Secretary is the proper defendant in a federal-sector action under Title VII and the Rehabilitation Act. 42 U.S.C. § 2000e-16(c); 29 U.S.C. § 794a.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

8.      On April 11, 2024, Plaintiff timely initiated contact with an Agency EEO Counselor regarding the discrimination, harassment, and retaliation described herein. On the same

date, following a meeting at which Ms. Kay-Decker berated Plaintiff and Plaintiff alleged that she was being subjected to harassment and a hostile work environment, an internal Anti-Harassment/Hostile Work Environment case concerning Ms. Kay-Decker's conduct was opened based on Plaintiff's allegations, Agency Case No. 2024-1315-30 WG. Ms. Kay-Decker was accordingly aware of Plaintiff's harassment and hostile work environment allegations against her no later than April 11, 2024 — seven days before she issued Plaintiff's FY 2024 Mid-Year Review.

9.      Plaintiff's informal complaint was mediated, unsuccessfully, on June 5, 2024. Plaintiff requested and received a Notice of Right to File a formal complaint, and on June 21, 2024 — within fifteen calendar days — Plaintiff timely filed a formal EEO complaint of discrimination, Agency Case No. IRS-24-0688, alleging discrimination and harassment based on race, color, national origin, and reprisal arising from eleven enumerated incidents, including the April 18, 2024 FY 2024 Mid-Year Review and the April 25, 2024 Letter of Admonishment issued hours after Plaintiff's written rebuttal opposing discrimination. The Agency accepted the complaint and conducted an investigation.

10.     On or about April 8, 2025, Plaintiff timely requested a hearing before an Equal Employment Opportunity Commission ("EEOC") Administrative Judge. The matter was docketed as EEOC No. 570-2025-00771X (Washington Field Office) and assigned to Administrative Judge Bryan M. Douglas, who held an Initial Conference on July 17, 2025, and directed the parties to conduct discovery. Following a lapse of appropriations and temporary government closure, the Administrative Judge, by Scheduling Order dated November 20, 2025, set the close of discovery for December 19, 2025 and a summary-judgment briefing schedule.

11.     On January 9, 2026, the Agency moved for summary judgment; Plaintiff opposed on January 26, 2026; and the Agency replied on February 2, 2026. On May 27, 2026, the

Administrative Judge granted the Agency's motion, issued a decision without a hearing pursuant to 29 C.F.R. § 1614.109(g), and entered judgment in favor of the Agency.

12.     On July 2, 2026, the Agency issued its Final Order pursuant to 29 C.F.R. § 1614.110(a), which it transmitted to Plaintiff by electronic mail on that same date. This action is timely filed within ninety (90) days of Plaintiff's receipt of the Agency's final action. 42 U.S.C. § 2000e-16(c); 29 C.F.R. § 1614.407(a). Plaintiff has not filed an appeal with the EEOC Office of Federal Sector and elects to proceed de novo in this Court.

13.     The retaliatory and discriminatory acts occurring from 2024 through 2026 described below — including the concealment of two detail opportunities, the reduction-in-force notices, the undisclosed FY 2024 and FY 2025 performance evaluations, Plaintiff's concealed reassignment back to a dissolved organization under Ms. Kay-Decker, the denial and undermining of reasonable accommodations, the AWOL charge, the withholding of pay and placement on leave without pay, and the obstruction of Plaintiff's medical leave — arose during the pendency of, grew out of, and are like or reasonably related to the claims exhausted in Agency Case No. IRS-24-0688, and constitute retaliation for the very administrative process at issue. They are accordingly properly before this Court. These acts are also component acts of the same hostile work environment practice exhausted in Agency Case No. IRS-24-0688, having been perpetrated by the same officials, against the same employee, as part of the same course of conduct. These 2026 acts are retaliation for, and grew directly out of, Plaintiff's protected EEO activity and the then-pending EEOC proceeding in Agency Case No. IRS-24-0688, and fall within the scope of the administrative process Plaintiff has already exhausted; separate counseling is therefore not required. To the extent separate exhaustion could be thought necessary as to any discrete act, any applicable time limit is subject to extension and equitable tolling under 29 C.F.R. § 1614.105(a)

(2): Plaintiff was medically incapacitated and under intensive psychiatric treatment throughout the relevant period; the Agency directed Plaintiff's related 2026 complaints into its internal anti-harassment process rather than EEO counseling; and the Agency's withholding of pay and refusal to correct Plaintiff's records recur with each affected pay period as a continuing violation. Plaintiff reserves the right to pursue any separately required administrative remedies as to these discrete acts.

## FACTUAL ALLEGATIONS

### A.    Ms. Gu's Distinguished Record of Federal Service

14.    Ms. Gu has served the IRS for more than a decade. Beginning in or about 2013, she served as a front-line manager (IR-2210-03, at the GS-15 level) in the IRS Information Technology organization. She thereafter completed successive leadership assignments, including as Deputy Director, Enterprise Systems Testing (February 2020 – October 2020), and as Executive Project Director / Assistant to the Co-Director, Enterprise Digitization Case Management Office (October 2020 – October 2021), and graduated from the IRS Executive Readiness ("XR") program in March 2022. Since 2022, Ms. Gu has been rated "Best Qualified" for senior executive positions, including Chief Taxpayer Experience Officer, Deputy Chief Taxpayer Experience Officer, and Deputy Chief Tax Compliance Officer for Strategy and Analytics.

15.    In or about May 2022, Ms. Gu was competitively selected as a Supervisory Management and Program Analyst (senior manager), IR-0343-1, in the TXO Portfolio Management Office, where she led the largest organization in the PMO — approximately thirty-three employees, including two front-line managers.

6

16.     Prior to the events at issue, Ms. Gu consistently received "Outstanding" performance ratings, including from Mr. Kenneth Corbin, the first Chief Taxpayer Experience Officer, and Mr. David Alito, the first Deputy Chief Taxpayer Experience Officer.

17.     At all relevant times, Ms. Gu's first-level supervisor was Courtney Kay-Decker, Deputy Chief Taxpayer Experience Officer. Ms. Gu's second-level supervisors during the relevant period included Dietra Grant, Deputy Chief, Taxpayer Services, and Carolyn Singh, Deputy Chief of Staff and Chief, Legislative and Regulatory Affairs, Office of the Commissioner. Kenneth Corbin, then-Chief Taxpayer Experience Officer, concurred in discipline against Plaintiff as alleged below; Fumino Tamaki later served as Chief Taxpayer Experience Officer. Lindsey Buckholz ("Ms. Buckholz") served as Chief of Staff, TXO; Ms. Buckholz was never in Plaintiff's chain of command and served at the same IR-1 level as Plaintiff until she was detailed to Taxpayer Services as a GS-15.

18.     Ms. Gu was the only Chinese-American senior manager reporting to Ms. Kay-Decker, and one of only two Chinese-American employees in TXO. The other, Mr. Nicholas Lee, a non-supervisory GS-14 employee in the PMO, was likewise subjected to adverse treatment and has pursued his own EEO complaint (Agency Case No. IRS-24-0619; EEOC Appeal No. 2026003024), reflecting a pattern of discriminatory treatment of Chinese-American employees within TXO.

19.     Ms. Gu is presently a Senior Manager assigned to Taxpayer Services (TS). Her manager of record in the Agency's human-resources systems is Dietra Grant, Deputy Chief, Taxpayer Services — not Ms. Kay-Decker.

**B.     The Fabricated Anonymous "Anti-Harassment" Inquiry and Concealment of Its Results**

20.    In or about May 2024, Ms. Kay-Decker acknowledged to an EEO Counselor, in words or substance, that as early as October 2023 she had wanted to rate Ms. Gu as merely "met" on her FY 2023 annual appraisal — notwithstanding Ms. Gu's history of "Outstanding" ratings — but felt she had not yet given Ms. Gu enough "coaching." Upon information and belief, Ms. Kay-Decker thereafter resolved to remove Ms. Gu from senior management and began constructing a pretextual record to justify doing so.

21.    In or about October 2023, an anonymous complaint of non-sexual "harassment/bullying" was lodged against Ms. Gu by an alleged victim who "requested to remain anonymous." No complainant was ever identified to Ms. Gu. The seven allegations concerned routine managerial matters such as deadlines, meeting scheduling, and management style. Upon information and belief, the complaint was solicited, encouraged, orchestrated, or fabricated at the instance of TXO leadership as part of the effort to build a case against Ms. Gu.

22.    A management inquiry was conducted from November 2, 2023 to November 21, 2023, with a supplemental report completed on February 2, 2024 — after, upon information and belief, Ms. Kay-Decker orchestrated a revision of the initial report, and notwithstanding that the Internal Revenue Manual required the matter to be closed within approximately one month, by December 2023. During the inquiry, at management's request, the inquiry official conducted a follow-up interview of Ms. Gu on January 18, 2024, at which Ms. Gu provided fuller detail in response to general background questions she had first been asked on November 15, 2023. Ms. Gu answered all questions truthfully at both interviews.

23.    Upon information and belief, the inquiry did not conclude that Ms. Gu engaged in harassment — indeed, Ms. Kay-Decker herself summarized the result in an email as finding no harassment. Upon information and belief, after learning of that result, Ms. Kay-Decker — far from

treating the inquiry as "independent," as she later testified — directed changes to the inquiry report and directed that the January 18, 2024 follow-up interview of Ms. Gu be conducted, addressing the inquiry official familiarly (e.g., "Hey ladies") in the process. The Agency never provided Ms. Gu with the inquiry report or its findings at the time; it concealed the exculpatory results from her, while Ms. Kay-Decker simultaneously characterized the inquiry to others as having "confirmed" allegations against Ms. Gu and invoked it to justify successive adverse actions against her. The Agency withheld the anti-harassment inquiry report for approximately two years, producing it to Ms. Gu only on December 19, 2025 — the last day of discovery in the administrative proceeding — and then relied on that very report in its February 2, 2026 reply brief, after Ms. Gu's opportunity to test it through discovery had closed.

24.    Ms. Kay-Decker actively directed the scope of the supposedly independent inquiry. On December 1, 2023, while the inquiry was ongoing, she sent an email titled "Follow up re AH issue" to Labor Relations and the inquiry official, writing: "Before I meet with LR, I'd like to see if it is possible for Denise to have a follow up interview with AH asking again (in whatever way is appropriate) the questions on training and mentor/coach." She attached Ms. Gu's internal training records and mentor-related communications. Those subjects were not part of the original anonymous complaint; they were introduced at Ms. Kay-Decker's direction to manufacture a basis to attack Ms. Gu's credibility and support a charge of "lack of candor." Consistent with that request, the follow-up interview of Ms. Gu occurred on January 18, 2024. Ms. Kay-Decker's direction of the inquiry's scope, her supplying of materials to the inquiry official, and her request for additional interviews are inconsistent with her later sworn characterization of the inquiry as an independent, third-party investigation.

**C.    The Early-2024 Campaign to Force Ms. Gu Out of Management**

25. On or about March 6, 2024, Ms. Kay-Decker discouraged Ms. Gu from following up on critical information, then berated Ms. Gu for the resulting lapse.

26. On or about March 7 and March 11, 2024, Ms. Kay-Decker — contradicting her own prior critiques and Ms. Gu's record — falsely accused Ms. Gu of lacking "coalition-building" skills, and wrote to Ms. Gu that she should "think about whether people management may not be the best fit for you."

27. On or about March 11, 2024, Ms. Kay-Decker pressed Ms. Gu to accept a non-supervisory position and refused to sponsor her for the Candidate Development Program — for which Ms. Gu had been rated "Ready Now" by the Chief Information Officer before she joined TXO — invoking the anonymous inquiry.

28. On or about March 19, 2024, management scheduled a meeting materially affecting Ms. Gu's team without appropriate notice to her, undercutting her authority.

29. On or about March 21, 2024, Ms. Kay-Decker suggested that Ms. Gu seek employment elsewhere. That same day — before any charge had been discussed with Ms. Gu — Ms. Kay-Decker sought her supervisor's concurrence in a Letter of Admonishment against Ms. Gu, which Mr. Kenneth Corbin provided on or about March 26, 2024.

30. On or about April 4, 2024, management excluded Ms. Gu from participation in the 2024 Nationwide Tax Forums without disclosing the selection criteria.

31. On or about April 8, 2024, Ms. Gu was informed that Ms. Kay-Decker planned to replace her with a White male colleague, Justin Axelrod ("JA").

32. On or about April 10, 2024, Ms. Gu learned that a data call response she had submitted was altered without her knowledge in a manner that unfairly targeted her.

10

33.     On April 11, 2024, Ms. Kay-Decker converted a one-on-one meeting with Ms. Gu into a meeting attended by her assistant and used the occasion to berate Ms. Gu.

**D.     Ms. Gu's Protected Activity and the Agency's Immediate Retaliation**

34.     Ms. Gu's protected activity began well before April 2024. Beginning in or about October 2023, Ms. Gu engaged in protected opposition activity by advocating for the fair and non-discriminatory treatment of a subordinate, Mr. Nicholas Lee — the only other Chinese-American employee in TXO — including by submitting Mr. Lee's Leadership Succession Review to Ms. Kay-Decker for approval. Ms. Kay-Decker and Ms. Buckholz delayed and obstructed that approval. In sworn EEO testimony in his own matter (Agency Case No. IRS-24-0619), Mr. Lee attested that Ms. Gu's advocacy on his behalf was "her own form of protected EEO activity" opposing discriminatory treatment, and that he believed Ms. Gu's protected activity "directly triggered increased hostility and retaliation" from Ms. Kay-Decker, Ms. Buckholz, and others against Chinese-American employees. This earlier opposition activity predated the Agency's decisions to admonish and remove Ms. Gu.

35.     On April 11, 2024, Ms. Gu further engaged in protected EEO activity by initiating contact with an EEO Counselor (Agency Case No. IRS-24-0688), and, following the meeting at which Ms. Kay-Decker berated her — demanding that Ms. Gu turn on her camera while refusing Ms. Gu's request that the session be recorded — Ms. Gu alleged that Ms. Kay-Decker was subjecting her to harassment, unfair treatment, and a hostile work environment, resulting in the opening that same day of internal Anti-Harassment/Hostile Work Environment Case No. 2024-1315-30 WG concerning Ms. Kay-Decker's conduct. Ms. Kay-Decker was aware of those allegations against her no later than April 11, 2024.

11

36.     Seven days later — four working days later — on or about April 18, 2024, Ms. Kay-Decker issued Ms. Gu's FY 2024 Mid-Year Review. The review contained multiple false statements regarding purportedly deficient performance and improperly relied on events outside the rating period, in stark contrast to Ms. Gu's record of "Outstanding" ratings, including the "Outstanding" rating she received after joining TXO under its first Chief Taxpayer Experience Officer, Mr. Kenneth Corbin, and its first Deputy Chief Taxpayer Experience Officer, Mr. David Alito.

37.     On April 25, 2024, at 12:28 p.m., Ms. Gu submitted a written rebuttal to the Mid-Year Review in which she both refuted its false statements and expressly accused Ms. Kay-Decker of racial discrimination. The rebuttal was protected opposition activity under Title VII.

38.     On April 25, 2024, at 2:53 p.m. — two hours and twenty-five minutes after Ms. Gu's rebuttal — Ms. Kay-Decker issued Ms. Gu a Letter of Admonishment charging that Ms. Gu "lacked candor in a matter of official interest" in connection with the anonymous anti-harassment inquiry.

39.     The charge was false and pretextual. Ms. Gu did not lack candor: her January 18, 2024 follow-up interview — requested by management itself — merely supplemented general background answers she had given on November 15, 2023. The admonishment rested on the same fabricated, anonymous inquiry whose exculpatory findings the Agency concealed from her.

40.     On or about May 8, 2024, the Agency removed Ms. Gu from her PMO leadership role through a manipulated and involuntary "detail" assignment and installed JA — a White male who already served as chief of another TXO office — as her replacement, consolidating two senior roles in one White male employee. By a broadcast email to the entire Taxpayer Experience Office, sent after business hours on the Thursday evening before the Memorial Day holiday weekend

12

while Ms. Gu remained on approved FMLA leave, Ms. Kay-Decker publicly "congratulated" Ms. Gu on the "opportunity" while announcing her removal. Ms. Gu's own staff learned of her removal from that email before she did and contacted her in alarm. The removal was effected without the required Human Resources approval, as alleged below.

41. The circumstances of Ms. Gu's removal reflect preselection and pretext. Upon information and belief, as early as May 23, 2024, TXO leadership had prepared two alternative versions of Ms. Gu's reassignment letter before her receiving assignment had even been finalized — one contingent on an information-technology detail and a backup assigning her to an open IR-01 position "while we work through the other processes" — reflecting that the decision to remove Ms. Gu had already been made and that leadership was constructing a mechanism to justify it. Contemporaneous communications reflect concern that the reporting structure might "trigger" Ms. Kay-Decker.

42. The Agency installed JA as PMO Chief before obtaining the required Human Resources approval for the personnel action. An August 29, 2024 email stated that "HR is pushing back on processing PAR action for JA as PMO Chief," yet JA had already assumed the duties and, in official communications, held himself out as "Acting Branch Chief, Portfolio Management Office." Upon information and belief, statements by Ms. Kay-Decker and JA in their sworn affidavits regarding the timing and circumstances of Ms. Gu's replacement are materially inconsistent with these contemporaneous records, creating genuine disputes of material fact as to the accuracy and credibility of those affidavits.

43. The Agency's own contemporaneous records show that Ms. Gu's protected FMLA leave was used as the stated justification for installing JA. In a September 5, 2024 draft justification, a TXO human-resources liaison wrote that "TXO is requesting Justin Axelrod to be

detailed in to the Senior Manager position for PMO," a position "currently held by Weiwen Gu," who had "been on extended leave … with an uncertain return date," and stated that Ms. Gu's "extended absence has created significant operational gaps." Using Ms. Gu's protected medical leave as a negative factor to justify replacing her — when JA, not Ms. Gu, in fact occupied the role during her absence — is further evidence of retaliation and disparate treatment.

44. At the time of her removal, Ms. Gu was on approved leave and had formally designated Mr. Paulo James as acting manager to ensure continuity of PMO operations. That designation was disregarded when JA assumed the role without completed HR approval. Mr. James — who had previously resolved through settlement an EEO/anti-harassment matter involving allegations against Ms. Kay-Decker, JA, and Ms. Buckholz — was later removed from the Agency and has filed an appeal before the Merit Systems Protection Board with representation by the National Treasury Employees Union. Ms. Gu offers these facts as background regarding the sequence of events and participants, not as proof of the merits of Mr. James's separate claims.

45. Upon information and belief, while Ms. Gu was on approved FMLA leave, Ms. Kay-Decker coordinated with information-technology personnel to access Ms. Gu's IRS email account and change Ms. Gu's designated out-of-office acting manager from Mr. James to JA — further evidence that the replacement of Ms. Gu was orchestrated rather than the product of ordinary personnel administration.

46. Agency witnesses corroborate the discriminatory character of this treatment. Among others, TXO employee Paulo James testified in the administrative record, in words or substance, that "significant injustices have occurred in TXO, particularly affecting the highly educated, accomplished, and ambitious employees of Asian and African descent," and that he was

14

"confident that color, ethnicity, national origin, and race were the primary influences" in Ms. Gu's treatment.

47.    On April 17, 2025, the Agency's Office of Civil Rights and Compliance closed Ms. Gu's internal Anti-Harassment case (No. 2024-1315-30 WG) with findings against Ms. Kay-Decker and Ms. Buckholz confirming a hostile work environment, substantially validating the allegations underlying Ms. Gu's EEO complaint.

**E.    June 2024: Plaintiff's Hospitalization and Ms. Kay-Decker's Conduct at Mediation**

48.    On or about June 3, 2024, as a result of the sustained harassment, discrimination, and retaliation described herein, Ms. Gu suffered a severe mental health crisis requiring emergency hospitalization.

49.    During the June 5, 2024 mediation session concerning Ms. Gu's informal EEO complaint, Ms. Gu's counsel informed Ms. Kay-Decker and the Agency's representatives that Ms. Gu had just been hospitalized, was experiencing severe psychological symptoms including suicidal ideation, and that her condition resulted from the ongoing harassment, discrimination, and retaliation at issue.

50.    Despite having been expressly advised of Ms. Gu's acute mental health crisis, Ms. Kay-Decker responded by recounting, in joint session and in the presence of all mediation participants, that a relative of hers had actually died by suicide. The statement was gratuitous, was made with knowledge of Ms. Gu's recent psychiatric hospitalization and suicidal ideation, created a foreseeable risk of aggravating Ms. Gu's crisis, and demonstrated deliberate disregard for Ms. Gu's known psychological vulnerability and safety. This conduct was not an offer of compromise and is not alleged to prove the validity or amount of Ms. Gu's underlying claims; it is alleged as

15

an independent act of harassment and disability-related discrimination, and it forms part of the continuing pattern of retaliation and hostile work environment alleged herein.

51.    The mediation was unsuccessful, and Ms. Gu timely proceeded with her formal complaint, which the Agency accepted for investigation.

**F.    Continuing Retaliation Through Organizational Manipulation (2024–2026)**

52.    Following her protected EEO activity, the Agency engaged in a continuous course of retaliatory conduct by repeatedly manipulating Ms. Gu's organizational placement, supervisory relationships, performance management, and working conditions, rather than making legitimate personnel decisions based on operational needs.

53.    Ms. Gu was detailed to the Research, Applied Analytics, and Statistics ("RAAS") organization, where she continued to perform successfully. RAAS retained Ms. Gu while returning most other detailed employees to their home business operating divisions; sponsored her application to a highly competitive, government-wide, in-person AI Government Leadership Program; and Ms. Gu became the only RAAS participant selected to attend, and to successfully graduate from, that program — reflecting RAAS's recognition of her leadership abilities and specialized expertise in artificial intelligence and data governance.

54.    Even so, Ms. Gu's written RAAS offer was altered on more than one occasion — from a firm human-resources job offer, to a reassignment, to a detail — through a human-resources point of contact later identified by RAAS management as embedded from TXO. Upon information and belief, this reflected continued interference by TXO leadership with Ms. Gu's employment status and organizational placement.

55.    On or about March 9, 2025, before the April 2025 reduction-in-force, the Agency concealed from Ms. Gu a detail opportunity in the Office of the Commissioner (a detail not to

16

exceed January 24, 2026). Upon information and belief, that opportunity would have removed Ms. Gu from the organizational structure the Agency later invoked as the basis for reduction-in-force actions against her. In or about July 2025, after the reduction-in-force, the Agency concealed from Ms. Gu a second detail opportunity, from Taxpayer Services. And in or about January 2026, rather than allowing Ms. Gu's Office of the Commissioner detail to continue through its January 24, 2026 term, the Agency altered or cancelled that placement and returned her — effective on or about January 26, 2026 — to the dissolved TXO under Ms. Kay-Decker, as alleged below.

56. TXO was subsequently liquidated. The Agency nevertheless issued Ms. Gu reduction-in-force ("RIF") notices premised on the complete (100%) elimination of TXO, even though Ms. Gu was then serving successfully outside TXO in RAAS. That rationale was inconsistent with Ms. Gu's actual organizational assignment and, upon information and belief, with the Agency's own stated RIF practice that an employee serving successfully outside a liquidated component would not be subject to RIF absent a total (100%) elimination affecting her actual assignment. A RAAS executive, questioning the basis for the action, asked Ms. Gu in substance, "Are you sure TXO is 100% liquidated?" Ms. Gu was, upon information and belief, the only affected employee issued a RIF notice under these circumstances, notwithstanding RAAS's efforts to retain her.

57. Thereafter, RAAS management progressively distanced itself from Ms. Gu. She experienced increasing isolation, reduced communication, diminished leadership engagement, and growing uncertainty regarding her organizational placement.

58. Ms. Gu's FY 2024 and FY 2025 annual performance evaluations were completed and signed by her manager alone, without first being shared or discussed with her and without affording her the ordinary opportunity to review, discuss, or sign them before they became final

— the same irregular practice reflected in the FY 2024 Mid-Year Review, and one Ms. Gu had not experienced in her prior years of federal service.

59.    RAAS leadership acknowledged the uncertainty surrounding Ms. Gu's organizational status, stating to her, in substance: "TXO has always been a grey area for you" — reflecting that even her receiving management questioned the Agency's rationale for its treatment of her.

60.    Notwithstanding Ms. Gu's successful performance in RAAS and the Agency's investment in her AI leadership development, the Agency reassigned Ms. Gu back to TXO after TXO had already been dissolved and substantially reorganized into Taxpayer Services. Upon her return, Ms. Gu was the only employee reporting directly to Ms. Kay-Decker, while the remaining former TXO employees had been reassigned or detailed elsewhere. There was no legitimate business justification for returning Ms. Gu to a dismantled organization — first subjecting her to RIF notices premised on TXO's total elimination, then returning her to that same "eliminated" organization as her harasser's sole direct report.

61.    The Agency made that assignment despite a physician-issued medical restriction requiring zero contact between Ms. Gu and Ms. Kay-Decker, and despite Ms. Gu's repeated requests, as a reasonable accommodation, that Ms. Kay-Decker be removed from her chain of command — an accommodation no Agency official ever disapproved. The Agency's organizational decisions undermined the effectiveness of Ms. Gu's medical restrictions and requested accommodation.

62.    These adverse organizational decisions continued even as Ms. Gu's health deteriorated and she entered intensive treatment, as described below.

18

63.     Viewed collectively, the concealment of the Office of the Commissioner detail opportunity; the RIF notices premised on the elimination of an office in which Ms. Gu no longer served; the concealment of the Taxpayer Services detail opportunity; the undisclosed FY 2024 and FY 2025 performance evaluations; the acknowledged uncertainty regarding her placement; her isolation within RAAS; the alteration or cancellation of her Office of the Commissioner detail effective on or about January 26, 2026; and her concealed reassignment to a dissolved organization as Ms. Kay-Decker's only direct report in disregard of documented medical restrictions, were not isolated personnel decisions but a continuous pattern of retaliation, discrimination, and interference with Ms. Gu's protected rights.

**G.     The 2026 AWOL Charge, Withheld Pay, and Interference with Medical Leave**

64.     As a direct result of the hostile and retaliatory treatment described above, Ms. Gu's health deteriorated, and she required extended medical leave. She submitted contemporaneous medical documentation to the Agency — including a physician's note dated January 23, 2026 excusing her from work from January 26 through February 6, 2026 — and sought leave protected by the FMLA.

65.     The Agency did not provide Ms. Gu the FMLA Eligibility Notice contemplated by 29 C.F.R. § 825.300(b) within five business days of acquiring knowledge that her leave may have been for an FMLA-qualifying reason. The Agency's failure to provide required FMLA notices contributed to confusion regarding Ms. Gu's leave status and was followed by adverse leave actions, including the AWOL charge described below, notwithstanding Ms. Gu's subsequent retroactive FMLA approval.

66.     On or about February 6, 2026 — three days after the Agency filed its February 3, 2026 reply in support of summary judgment — and while Ms. Gu's medical documentation and

FMLA paperwork were pending, the Agency charged Ms. Gu as AWOL. At the time, Ms. Kay-Decker had actual knowledge of Ms. Gu's protected EEO activity — including the then-pending EEOC proceeding in this very matter — and was in active email communication with Ms. Gu. No one made any reasonable effort to verify Ms. Gu's leave status with Ms. Gu, Human Resources, or FOH before designating her AWOL. Upon information and belief, Ms. Buckholz — who was never in Ms. Gu's chain of command — altered Ms. Gu's records in the Single Entry Time Reporting ("SETR") system from approved sick leave to AWOL. The Agency effected the charge by initiating, without Ms. Gu's knowledge, a SETR time-and-attendance correction that reopened leave already approved, certified, and closed as sick leave and reclassified it as AWOL.

67.     The Agency applied its honesty-and-candor standards unequally. Ms. Kay-Decker invoked purported "lack of candor" to admonish Ms. Gu and to propose adverse action against another employee, Mr. James. Yet when Ms. Gu identified false or materially misleading statements in an official Government memorandum, prepared on Agency letterhead, used to support the AWOL charge, the Agency undertook no comparable misconduct inquiry or discipline. This double standard is further evidence of pretext and retaliation.

68.     Separately, at least approximately 150 hours of Ms. Gu's annual leave — which she had been on track to have restored or carried over — were removed from her SETR record without the record of forfeiture that ordinarily accompanies any such loss. Upon information and belief, Ms. Gu's leave and time records were improperly altered.

69.     The Agency also obstructed Ms. Gu's access to donated leave. Ms. Gu was approved for both the Voluntary Leave Transfer Program and the Leave Bank, under which she should have been placed on approved donated leave once her accrued balances were exhausted. Instead, by a July 27, 2026 memorandum signed by Ms. Kay-Decker as Chief Taxpayer

Experience Officer, the Agency notified Ms. Gu that she would be placed on leave without pay effective August 5, 2026 at 11:00 a.m. — despite those approvals and despite Dietra Grant, not Ms. Kay-Decker, being Ms. Gu's manager of record. In the same memorandum, Ms. Kay-Decker warned that Ms. Gu's medically necessary absence could render her "Not Ratable" for her annual performance appraisal — a further adverse consequence threatened directly by the very supervisor Ms. Gu's physician had ordered to have no contact with her.

70.    Ms. Kay-Decker's continued direct contact with Ms. Gu regarding her employment persisted even after Ms. Gu's counsel served a cease-and-desist letter on July 5, 2026 requesting that Ms. Kay-Decker cease direct contact consistent with Ms. Gu's physician-ordered no-contact restriction. This continued contact was inconsistent with Ms. Gu's medical restriction and reasonable accommodation and formed part of the continuing pattern of retaliation and interference alleged herein.

71.    Ms. Kay-Decker's contacts continued and escalated. Despite the no-contact restriction, the July 5, 2026 cease-and-desist letter, and her removal as Ms. Gu's manager of record, Ms. Kay-Decker caused correspondence regarding Ms. Gu's leave and benefits to be delivered to Ms. Gu's personal residence on or about July 29, 2026, while Ms. Gu was in intensive psychiatric treatment. Ms. Gu's treating physician has opined that continued exposure to Ms. Kay-Decker is a documented psychological trigger that has prevented Ms. Gu's recovery, prolonged her medical leave, and contributed to the exhaustion of her accrued annual and sick leave.

72.    FOH subsequently approved Ms. Gu's FMLA leave retroactively, effective January 26, 2026, confirming that her absence qualified for protected leave.

21

73. Notwithstanding that determination, the Agency refused — and continues to refuse, despite repeated requests — to remove the AWOL charge and to restore approximately one month of withheld pay.

74. Ms. Gu's application to the Voluntary Leave Transfer Program was processed and approved through the Agency's established Human Resources procedures, without Ms. Kay-Decker's involvement. After Ms. Kay-Decker was no longer Ms. Gu's manager of record, however, she attempted to interfere with Ms. Gu's access to approved leave benefits by advocating that Ms. Gu be placed on administrative leave rather than the extended FMLA leave supported by Ms. Gu's medical providers and approved through the appropriate processes.

75. Further, despite no longer serving as Ms. Gu's supervisor, and despite the physician-issued restriction requiring zero contact with Ms. Gu, Ms. Kay-Decker continued to inject herself into meetings involving Ms. Gu and to seek access to Ms. Gu's medical information without any legitimate business necessity — conduct inconsistent with the Rehabilitation Act's limits on disability-related inquiries and its confidentiality requirements, with Ms. Gu's pending reasonable accommodation, and with any legitimate supervisory role.

76. Ms. Gu remains under active medical care, including extended treatment in a Partial Hospitalization Program necessitated by worsening symptoms attributable to the prolonged retaliation and hostile work environment, and has been medically excused from work through October 31, 2026. Her paid leave balances — more than 2,000 hours of accrued annual and sick leave — have been consumed as a result of the Agency's conduct, and she is currently on a combination of FMLA leave, annual leave, sick leave, advanced sick leave, and leave without pay.

77. Despite producing more than 20,000 pages of discovery during the administrative proceedings, the Agency failed to identify competent factual evidence establishing a legitimate,

22

non-discriminatory, non-retaliatory basis for the adverse employment actions challenged in this Complaint. Instead, the discovery record documents the coordinated actions of Ms. Kay-Decker and others constituting harassment, discrimination, retaliation, and abuse of authority.

78. The discovery materials further contain substantial evidence bearing on Ms. Kay-Decker's credibility, including inconsistent statements, contradictory explanations, procedural irregularities, and documentary evidence undermining the Agency's asserted justifications — credibility disputes and conflicting evidence that preclude resolution of the material factual issues without judicial scrutiny.

79. As a direct and proximate result of the Agency's conduct, Ms. Gu has suffered and continues to suffer lost pay and benefits, damage to her professional reputation and career trajectory, humiliation, emotional distress, physical and psychological injury, and out-of-pocket medical and other expenses. Her career trajectory has been materially altered, resulting in lost wages, lost employment benefits, diminished future earning capacity, lost promotional and leadership opportunities, reduced retirement benefits, and other economic losses for which she seeks full make-whole relief.

## COUNT I

**(Discrimination Based on Race, Color, and National Origin —
Title VII, 42 U.S.C. § 2000e-16)**

80. Plaintiff realleges and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

81. Defendant, through its officials and agents, discriminated against Plaintiff because of her race (Asian), color, and national origin (Chinese) with respect to the terms, conditions, and privileges of her employment, including without limitation by issuing the false FY 2024 Mid-Year Review; issuing the April 25, 2024 Letter of Admonishment; removing her from her senior

manager leadership position and replacing her with a White male; excluding her from the 2024 Nationwide Tax Forums and other professional opportunities; denying her sponsorship for leadership development; concealing the Office of the Commissioner detail opportunity; concealing a second, Taxpayer Services detail opportunity; altering or cancelling her Office of the Commissioner detail and concealing her reassignment to the dissolved TXO as Ms. Kay-Decker's sole direct report; issuing RIF notices on a pretextual basis; issuing the undisclosed FY 2024 and FY 2025 evaluations; charging her AWOL; and withholding her pay and placing her on leave without pay.

82.    Similarly situated employees outside Plaintiff's protected classes were not subjected to such treatment. The only two Chinese-American employees in TXO — Plaintiff and Mr. Lee — were both subjected to adverse treatment by the same leadership.

83.    The reasons articulated by Defendant for its actions are false and a pretext for discrimination.

84.    As a direct and proximate result of Defendant's discrimination, Plaintiff has suffered economic loss, harm to her career and reputation, emotional distress, and physical and psychological injury.

## COUNT II

**(Retaliation — Title VII, 42 U.S.C. § 2000e-16, § 2000e-3(a))**

85.    Plaintiff realleges and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

86.    Plaintiff engaged in protected activity, including without limitation: (a) her opposition, beginning in or about October 2023, to discriminatory treatment of a Chinese-American subordinate, Mr. Nicholas Lee, including advocacy for his fair treatment and leadership advancement; (b) her April 11, 2024 initiation of EEO counseling; (c) her April 11, 2024

24

harassment and hostile work environment allegations against Ms. Kay-Decker, which resulted in the opening of internal Anti-Harassment Case No. 2024-1315-30 WG that same day; (d) her April 25, 2024 written rebuttal expressly opposing racial discrimination; (e) her June 21, 2024 formal EEO complaint; and (f) her participation in the ensuing EEOC investigation and hearing process from 2024 through 2026.

87. Defendant's officials, including Ms. Kay-Decker, were aware of Plaintiff's protected activity. Ms. Kay-Decker knew of Plaintiff's harassment allegations against her no later than April 11, 2024 — seven days before she issued the FY 2024 Mid-Year Review.

88. Defendant thereafter took materially adverse actions against Plaintiff, including without limitation the orchestrated anonymous anti-harassment inquiry and the concealed, revised report; the April 18, 2024 Mid-Year Review; the April 25, 2024 Letter of Admonishment issued two hours and twenty-five minutes after her written opposition to discrimination; her removal from her leadership position; the pretextual RIF notices; the undisclosed FY 2024 and FY 2025 performance evaluations; her reassignment to a dissolved organization as Ms. Kay-Decker's sole direct report in disregard of medical restrictions; the 2026 AWOL charge; the withholding of approximately one month's pay; the placement on leave without pay despite approved donated-leave programs; the refusal to correct her records after retroactive FMLA approval; and the obstruction of her leave and benefits.

89. Each such action well might dissuade a reasonable worker from making or supporting a charge of discrimination.

90. A causal connection exists between Plaintiff's protected activity and the adverse actions, as demonstrated by, among other things, Plaintiff's opposition activity beginning in October 2023, which preceded the Agency's decisions to admonish and remove her; Ms. Kay-

25

Decker's knowledge of Plaintiff's April 11, 2024 harassment allegations when she issued the Mid-Year Review seven days (four working days) later; the extraordinary temporal proximity between Plaintiff's April 25, 2024 rebuttal and the admonishment issued the same afternoon; the pre-drafted, dual-version removal letters and the installation of JA before HR approval, evidencing preselection; the escalating pattern of adverse treatment following each instance of protected activity; and Defendant's shifting and false explanations, which are contradicted by contemporaneous documents. Defendant's stated reasons are pretext for retaliation.

91.    As a direct and proximate result of Defendant's retaliation, Plaintiff has suffered economic loss, harm to her career and reputation, emotional distress, and physical and psychological injury.

## COUNT III

### (Discriminatory and Retaliatory Hostile Work Environment — Title VII, 42 U.S.C. § 2000e-16)

92.    Plaintiff realleges and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

93.    The conduct described above — including the orchestrated anonymous inquiry and concealment of its results; the repeated false criticisms and public beratings; the pressure to abandon management and to leave the Agency; the exclusion from professional opportunities; the false Mid-Year Review and Letter of Admonishment; the removal from leadership; Ms. Kay-Decker's June 5, 2024 suicide remarks made with knowledge of Plaintiff's hospitalization and suicidal ideation; the organizational manipulation, isolation, and forced return to Ms. Kay-Decker's supervision in disregard of medical restrictions; and the AWOL charge and withholding of pay — constituted unwelcome conduct based on Plaintiff's race, color, national origin, disability, and protected EEO activity, and was, in its totality, sufficiently severe or pervasive to

26

alter the conditions of Plaintiff's employment and to create an abusive working environment, and would have dissuaded a reasonable worker from making or supporting a charge of discrimination.

94.    The hostile work environment was created and perpetuated by Plaintiff's supervisors, including Ms. Kay-Decker, and culminated in tangible employment actions; Defendant is liable therefor. The Agency's own Office of Civil Rights and Compliance found that Ms. Kay-Decker and Ms. Buckholz subjected Plaintiff to a hostile work environment.

95.    As a direct and proximate result of the hostile work environment, Plaintiff has suffered economic loss, harm to her career and reputation, emotional distress, and physical and psychological injury, requiring ongoing intensive medical treatment.

## COUNT IV

**(Disability Discrimination, Failure to Accommodate, and Unlawful Medical Inquiries — Rehabilitation Act of 1973, 29 U.S.C. § 791)**

96.    Plaintiff realleges and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

97.    Plaintiff is a qualified individual with a disability within the meaning of the Rehabilitation Act and the standards of the Americans with Disabilities Act incorporated therein, 29 U.S.C. § 791(f); 42 U.S.C. § 12102. Plaintiff suffers from serious mental health conditions, caused or exacerbated by the conduct alleged herein, that substantially limit one or more major life activities, and which have required emergency hospitalization and ongoing treatment, including a Partial Hospitalization Program. Defendant had actual knowledge of Plaintiff's conditions no later than May 2024.

98.    Plaintiff requested reasonable accommodations, including physician-supported medical restrictions requiring zero contact with Ms. Kay-Decker and the removal of Ms. Kay-Decker from her chain of command, as well as medically supported extended leave. On January

27

23, 2026, Plaintiff's treating physician transmitted written medical restrictions to the IRS Human Capital Office specifying (1) zero contact with Ms. Kay-Decker, including by email, telephone, virtual meeting, or in person; (2) Ms. Kay-Decker's removal from Plaintiff's chain of command for work assignment, performance evaluation, and all administrative matters; and (3) communication firewalls routing all necessary communications through a neutral third party or alternative supervisor. No Agency official disapproved these accommodations, and they would not have imposed an undue hardship.

99.    Defendant failed to provide and undermined those reasonable accommodations, including by reassigning Plaintiff to report directly — and solely — to Ms. Kay-Decker; by permitting Ms. Kay-Decker to inject herself into meetings involving Plaintiff; by attempting to substitute administrative leave for medically supported FMLA leave; by failing to provide required FMLA notices; by placing Plaintiff on leave without pay despite approved donated-leave programs; and by charging Plaintiff AWOL for protected, medically necessary absences.

100.    Defendant further made and permitted disability-related inquiries of Plaintiff, and sought access to her medical information, without job-relatedness or business necessity, and failed to maintain and restrict access to her medical information as required, in violation of the standards of 42 U.S.C. § 12112(d) as incorporated by 29 U.S.C. § 791(f).

101.    Defendant's conduct also constituted discrimination and harassment on the basis of disability, including Ms. Kay-Decker's June 5, 2024 conduct undertaken with knowledge of Plaintiff's acute psychiatric crisis.

102.    As a direct and proximate result of Defendant's violations of the Rehabilitation Act, Plaintiff has suffered economic loss, emotional distress, and physical and psychological injury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

a.        Declare that Defendant's conduct violated Title VII of the Civil Rights Act of 1964, as amended, and the Rehabilitation Act of 1973, as amended;

b.        Order Defendant to rescind and expunge from all Agency records the April 25, 2024 Letter of Admonishment, the FY 2024 Mid-Year and Annual Reviews, the AWOL designation, and all related derogatory materials, and to restore Plaintiff's FY 2024, FY 2025, and FY 2026 performance ratings to "Outstanding," with supporting narratives consistent with those ratings;

c.        Order Defendant to restore all withheld pay, leave, and benefits — including more than 2,000 hours of accrued annual and sick leave — with interest as authorized by law, including the Back Pay Act, 5 U.S.C. § 5596, and to correct Plaintiff's leave, time (SETR), and payroll records to reflect approved FMLA and other protected leave;

d.        Order Defendant to provide Plaintiff's reasonable accommodations, including removal of Ms. Kay-Decker from any supervisory or organizational role over Plaintiff and enforcement of Plaintiff's physician-issued medical restrictions;

e.        Reinstate Plaintiff to her former Senior Manager position, or to a substantially equivalent position, with all attendant seniority, salary, benefits, retirement credit, and leave; or, in the alternative — if reinstatement is medically contraindicated or otherwise impracticable based on competent medical evidence — award front pay and such further equitable relief as will preserve Plaintiff's eligibility to pursue disability retirement;

f.        Award Plaintiff back pay and lost benefits, with prejudgment interest, pursuant to 42 U.S.C. § 2000e-16 and § 2000e-5(g);

g.      Award Plaintiff full make-whole relief for her materially altered career trajectory, including lost promotional and leadership opportunities, diminished future earning capacity, and reduced retirement benefits;

h.      Award Plaintiff compensatory damages for emotional distress, pain and suffering, harm to reputation, out-of-pocket medical expenses, and other pecuniary losses, in an amount to be determined at trial, pursuant to 42 U.S.C. § 1981a;

i.      Award Plaintiff her reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 2000e-5(k) and 29 U.S.C. § 794a; and

j.      Grant such other and further relief as the Court deems just and proper.

Dated: July 31, 2026

Respectfully submitted,

/s/ Bruce Fein

_____

Bruce Fein, Esq.
D.C. Bar No. 446615
LAW OFFICES OF BRUCE FEIN
300 New Jersey Avenue, N.W., Suite 300
Washington, D.C. 20001
Telephone: (202) 465-8728
Email: bruce@feinpoints.com

Counsel for Plaintiff Weiwen Gu

30